**CHESAPEAKE WESTERN RAILWAY; CSX Transportation, Incorporated; Interstate Railroad Company; Norfolk & Western Railway Company; Richmond, Fredericksburg & Potomac Railroad Company; Southern Railway Company, Plaintiffs–Appellants,**

v.

**William H. FORST, Tax Commissioner, Virginia Department of Taxation, His Successors in Office; David E. Jordan, Assistant Director, Property Tax Division, Virginia Department of Taxation, His Successors in Office; City of Alexandria; County Board of Arlington County, Virginia; County of Fairfax; County of Prince William, Virginia; County of Hanover, Virginia, Defendants–Appellees.**

No. 90–2920.

United States Court of Appeals,
Fourth Circuit.

Argued April 11, 1991.

Decided July 12, 1991.

Everett B. Gibson, argued Everett B. Gibson Law Firm, Memphis, Tenn. (Elizabeth B. Stengel, Everett B. Gibson Law Firm, Memphis, Tenn., Francis A. Cherry, Jr., Randolph, Boyd, Cherry and Vaughan, Richmond, Va., Courtney L. George, Associate Tax Counsel, CSX Transp., Inc., Jacksonville, Fla., Charles A. Hartz, Jr., Vice President and Gen. Counsel, Richmond, Fredericksburg and Potomac Rd. Co., Richmond, Va., Henry C. Wolf, Asst. Vice President and Tax Counsel, Norfolk Southern Corp., Norfolk, Va., James L. Sanderlin, McGuire, Woods, Battle & Boothe, Richmond, Va., on brief), for plaintiffs-appellants.

Charles G. Flinn, County Atty., argued, Arlington, Va. (Cynthea L. Perry, Sp. Counsel, Arlington, Va., Philip G. Sunderland, City Atty., Alexandria, Va., Thomas W. McCandlish, Mezzullo & McCandlish, Rich-

mond, Va., David T. Stitt, County Atty., Fairfax, Va., Mary Sue Terry, Atty. Gen. of Virginia, K. Marshall Cook, Deputy Atty. Gen., Barbara M. Rose, Sr. Asst. Atty. Gen., James G. Council, Asst. Atty. Gen., Richmond, Va., Sterling E. Rives, III, County Atty., Hanover, Va., Sharon E. Pandak, County Atty., Prince William, Va., on brief), for defendants-appellees.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and HAMILTON, District Judge for the District of South Carolina, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

Chesapeake Western Railway and several other railroads which operate in Virginia appeal the decision of the district court granting summary judgment on behalf of the state tax commissioner and upholding Virginia's method of valuing railroad property. The companies contend that Virginia's valuation method for railroad property impermissibly discriminates against railroads by valuing railroad property in excess of its true market value. This, they contend, violates § 306 of the Railroad Revitalization and Regulatory Reform Act (the 4–R Act), Pub.L. No. 94–210, 90 Stat. 54, now codified at 49 U.S.C. 11503.[1] Because we hold that challenges to state valuation methods are not cognizable under § 306, we now affirm.

## I

From early in this century until the 1984 tax year, the state of Virginia assigned the responsibility of assessing railroad property, for the purposes of *ad valorem* taxation, to the Virginia State Corporation Commission (SCC). The SCC was assigned the task of valuing railroad property at fair market value. In compliance with this mandate, the SCC adopted two methods for valuing railroad property: one for railroad land, and another for railroad property other than land. First, with respect to railroad land, the SCC calculated fair market value by comparing the property with adjacent or nearby industrial and commercial property. This is known as the "across-the-fence" or "over-the-fence" valuation method because it bases the best use and value of the railroad property on the use and value of the land across the fence from the railroad land. The value of railroad property other than land, on the other hand, was based on the original investment in the property, minus a fixed percentage of that investment—varying depending on the particular property involved—as allowance for depreciation. These two methods are examples of what is known as the "inventory and summation" approach to assessment.

In 1984, the Virginia legislature transferred the responsibility for assessing railroad property to the Virginia Department of Taxation (DOT). The DOT decided to abandon the SCC's inventory and summation approach, replacing it with the "unit method" of valuation. Under the unit method, the entire railroad is valued as a single property unit, based on the business value of railroad operations. The value of the railroad's property within a given state is then determined based on the proportion of the railroad's total operation which exists within that state. Similarly, the value of the railroad property within any given locality is proportionately based on the extent of that railroad's presence in the locality.

Dissatisfied by the lower tax revenue produced by the unit method, the City of Alexandria and the County of Arlington filed suit in state court to enjoin the use of this method. They argued that use of the unit method of valuation violated the Virginia constitution because it failed to determine the fair market value of railroad property. The Virginia Supreme Court agreed with Arlington and Alexandria. It held

---

1. Section 306 was originally codified at 49 U.S.C. § 26c, but in 1978 Congress called for recodification of the Interstate Commerce Act. The statute calling for recodification did not make any substantive changes in § 306. *Clinchfield R.R. v. Lynch*, 700 F.2d 126, 128 n. 1 (4th Cir.1983). For the purposes of this opinion, we will simply refer to § 306.

that the unit method constituted a business tax rather than a real property tax, and it struck down its use as unconstitutional. *County Board v. Virginia Dep't of Taxation,* 393 S.E.2d 194 (Va.1990). In 1990, the state reverted back to the inventory and summation method, assessing values in the same fashion as the SCC had done prior to 1984.

Appellant railroads proceeded to file suit in the District Court for the Eastern District of Virginia, charging that valuation of railroad property under the inventory and summation methods resulted in such property being assessed at a value greater than true market value. Noting that all other property in the state is valued at or below fair market value, the railroads argued that Virginia's tax scheme resulted in discriminatorily high taxation of railroad property, in violation of § 306 of the 4–R Act. The district court granted summary judgment to the defendants, finding that "the language and legislative history of the Act make clear that it does not impose a particular method of taxation on the state" and that the expert opinions offered were not sufficiently conclusive to create a factual issue on the question of discriminatory taxation. The railroads now appeal.

## II

The railroads argue that the tax scheme discriminates against railroad property in violation of § 306 of the 4–R Act.[2] Section 306 states that:

[i]t is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:

(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.

Section 306 also specifies that:

no relief may be granted under this section unless the ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction.

The railroads argue that the methods of valuation currently employed by Virginia to determine "true market value" of railroad property in fact produce property values which are far in excess of "true" market value. If the railroads are correct, this means that the ratio of assessed value to true market value for railroad property is therefore greater than one. The parties agree that all other property in the state is assessed at, or below, true market value. Thus, for all property other than railroad property, the ratio of assessed value to true market value is less than, or at most equal to, one. In light of this alleged disparate treatment of railroad property, the railroads argue that Virginia's tax assessment scheme violates § 306.

The question before us is whether § 306 provides a basis for a party to challenge the accounting method by which a state values railroad property. Clearly, a party may challenge a state's *calculations* of true market value, under the state's operative valuation methods, to insure that taxes are not levied discriminatorily. *Burlington Northern R.R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461–63, 107 S.Ct. 1855, 1859–61, 95 L.Ed.2d 404 (1987). The Supreme Court has specifically left open the question, however, of whether § 306 allows a railroad to challenge "the appropriateness of the accounting methods by

---

**2.** This is not the first time this claim has been brought against the state. In *Richmond, F. & P. R.R. v. State Corp. Comm'n,* 336 S.E.2d 896, 896–97 (Va.1985), one appellant in this case presented a § 306 discrimination claim before the Virginia Supreme Court. The Court rejected the claim. No issues of collateral estoppel appear to have been raised here.

which the state determined the railroad's value." *Id.* at 463 n. 5, 107 S.Ct. at 1861 n. 5.

We believe that § 306 does not provide a basis for parties to challenge a state's preferred accounting method. As an initial matter, we note that Congress has enacted a general proscription on federal interference in state taxation decisions. *See* 28 U.S.C. § 1341; *Burlington Northern R.R. v. Lennen,* 715 F.2d 494, 498 (10th Cir. 1983). While § 306 was passed as an express exception to the policy of non-interference, *id.,* we are not inclined to disregard this general policy in areas where § 306 does not plainly authorize such an exception and where the federal courts are ill equipped to evaluate the merits of a challenge to a state taxation scheme. The appellant's position suffers from both of these infirmities.

The Supreme Court has held that § 306 unambiguously provides a basis for railroads to challenge a state's calculation of the true market value of railroad property under whatever accounting system prevails in a given state. *Burlington Northern R.R. v. Oklahoma Tax Comm'n,* 481 U.S. at 461–63, 107 S.Ct. at 1859–61. On the other hand, the statute is not so explicit in explaining whether a railroad may challenge, in addition, the particular accounting method a state has determined to best estimate true market value. Since the statute is ambiguous on this latter question, we turn to the legislative history of § 306.

The legislative history of this section is admittedly rather thin. Nonetheless, although incomplete, the history that does exist suggests that Congress did not intend for courts to displace the state's policy choice about what constitutes the best method for determining true market value of railroad land. The committee report on Senate Bill 927 (a precursor to the legislation here) states that the bill

does not suggest or require a State to change its assessment standards, assess-

ment practices, or the assessments themselves. It merely provides a single standard against which all affected assessments must be measured in order to determine their relationship to each other. It is not a standard for determining value; it is a standard to which values that have already been determined must be compared.

S.Rep. No. 1483, 90th Cong., 2d Sess. app. B (1968). Similarly, a railroad representative testifying on another earlier version of the 4–R Act stated that it "would not deal with valuation being standard. The standards and methods of valuation that any State wishes to use would be totally unaffected by this legislation." *Hearing Before the Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce on H.R. 16245,* 91st Cong., 1st Sess. 138 (1970) (testimony of Philip M. Lanier), *quoted in, Burlington Northern R.R. v. Lennen,* 573 F.Supp. 1155, 1163 (D.Kan.1982). While we might be hesitant to rest our interpretation of § 306 on these materials alone, we are further convinced of the accuracy of our interpretation by the difficulty of judicial enforcement of any alternative understanding of the section.

The job of determining whether a particular valuation method produces a "true" market value involves, at its core, a policy choice. The concept of true market value is inherently an approximation, in some sense a fiction, since there is no such thing as a perfect market. This is particularly true of railroad land which, as the railroads point out, is subject to a good deal of regulation—actual and potential—by federal agencies. The United States District Court for the District of Utah recently has pointed this out in the course of struggling with a claim similar to the one at bar and attempting in the process to select the one valuation method that would produce a truly accurate fair market value.[3] *See Union*

3. Appellants suggest that they should at least be allowed to prove the present valuation system unreasonable. The problem with this argument is that § 306 does not limit state taxation schemes on the basis of their "reasonableness".

It regulates them based on whether or not the ratio of assessed value to true market value of railroad property is at least five percent greater than the ratio of assessed value to true market value of all other property in the state. The

*Pacific R.R. v. State Tax Comm'n,* 716 F.Supp. 543 (D.Utah 1988). There, railroads challenged Utah's methodology used for valuing railroad property. The court allowed the case to go to trial, attempting to determine through the assistance of expert testimony, which valuation method best calculated the true market value of railroad property.[4] At the end of trial, after considering extensive testimony, the court realized the difficult task involved in being asked to disapprove a state's method of valuing property. The court concluded that it could not determine whether the particular valuation method used in Utah discriminated against the railroads because it had no basis for determining which method produced the true market value of railroad property.

The *Union Pacific* court noted that true market value of property is difficult, if not impossible, to ascertain. "[T]here is no absolute way to test the assertions of competing valuations or competing claims of correspondence to 'true market value,' if such a thing exists in the order of things." *Id.* at 553. The court provided a rich explanation of the problem:

> From the six weeks of testimony in this case, however, certain things became apparent. First, valuation is an art, not a science. It is a function of judgment, not of natural law. Try as it might, even Congress is incapable of enacting either a natural law of the market or Plato's ideal. "True market value", then, must needs mean something else. Absent a miracle of time, place, and circumstance—willing buyer, willing seller, high noon, January 1, 1984, for example—true market value for the purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset. All of this is simply a sophisticated effort at "lets pretend" or "modeling", in modern jargon, and all of it involves judgment.

*Id.* at 554. The court also noted that "from all the evidence presented it is clear that there is more than one way to value a railroad.... All the methods may be equally rational given their underlying assumptions. And they are all irrational if pressed to extremes." *Id.* at 555. The court therefore concluded that the railroads could not establish that their proposed methodology of valuation was, in some absolute sense, "truer" than any other. The railroads here correctly note that the across-the-fence method of valuation used in Virginia is not employed for any property other than railroad property. They argue that the Virginia method is therefore facially inequitable since it treats railroad property like no other property in the state. Their solution—the unit method—is no better however, since no other property in the state is taxed by the unit method either. The point is that railroad property is unlike all other property in the state. Consequently, the valuation method for railroad property will necessarily differ from the methods used for other property in the state. And once one concedes that the

statute is clearly designed to preclude a court from doing exactly what appellants request—pass judgment on the reasonableness of a state taxation scheme—and instead is intended to limit consideration to the discrete, quantifiable task of determining the exact extent (if any) of discriminatory assessment.

4. One particular difficulty in challenging valuation methods under § 306 is that, in order to determine whether the state is discriminating against railroads by a factor of at least five percent, a court is compelled to determine what valuation method is the correct method. That is, we cannot conclude that the state is overtaxing railroads by five percent unless we know what the correct tax would be. To determine what the correct tax would be, we must determine what the correct valuation method is. Thus, we cannot simply reject a particular method as unfair; instead, we must also find that some other specific method is not only fair, but in fact singularly *correct.* As the court in *Union Pacific* pointed out, "[t]he court's decision on valuation must recognize (at least implicitly) one valuation method at the expense of other methods." 716 F.Supp. at 552. In essence, the railroads ask us not only to reject Virginia's inventory and summation approach but also to dictate to Virginia the specific valuation method that produces the "correct" market value.

valuation of railroad property requires a different method than that used for all other property, the choice of what alternative method to use is one of pure policy, unguided by any judicially determinable notion of "correctness" or "truth".

### III

We conclude that § 306 does not provide a basis for railroads to challenge a state's preferred methodology for ascertaining the true market value of railroad property. The statute simply does not authorize the judiciary to enter into the difficult task of second-guessing a state's policy assessment of how best to value property. In light of Congress' expressed preference against federal interference in state taxation policy, we believe that § 306 should be read narrowly, authorizing challenges to a state's calculation of fair market value, but not to a state's method for calculating such value. If Congress determines that one valuation methodology produces more accurate values than another, it may require states to utilize that accounting method. Section 306, however, does not authorize the courts to perform that task.

In § 306, Congress has insured that railroad and non-railroad property will be treated similarly under whatever valuation methods have been selected by a given state. If the Congress further desires to standardize the valuation side of the taxation process, it could set out the methodologies it thinks are fairest to railroads. The courts, however, cannot make that judgment without completely displacing the fact-finding and policymaking powers of state government. The 4–R Act does not authorize the judiciary to undertake the difficult, and arguably impossible, task of determining which specific assessment methodology produces true market value of railroad property. Consequently, we affirm the order of the district court granting summary judgment.

AFFIRMED.